STATE EX REL. BOORMAN ET AL., APPELLANTS, *v.* STATE BOARD OF LAND COMMISSIONERS ET AL., RESPONDENTS.

(No. 7,932.)

(Submitted June 27, 1939. Decided July 17, 1939.)

[94 Pac. (2d) 201.]

*Messrs. Murch & Wuerthner,* for Appellants, submitted a brief; *Mr. Julius J. Wuerthner* argued the cause orally.

*Mr. Harrison J. Freebourn,* Attorney General, and *Mr. Wesley W. Wertz,* Special Assistant Attorney General, for Respondents, submitted a brief; *Mr. Wertz* argued the cause orally.

MR. JUSTICE MORRIS delivered the opinion of the court.

This is an appeal from a judgment of the district court of the ninth judicial district quashing an alternative writ of mandate theretofore issued and dismissing the petition of appellants.

130

The proceeding involves the right of the State Board of Land Commissioners, hereinafter referred to as the board, to sell state land within the limits of a city or town or within three miles of such limits, except in alternate tracts of five acres each, and refund of the purchase price when not so sold.

The Northern Montana Lumber Company, a corporation, contracted to buy 160 acres of common school land from the state on May 6, 1910, for the consideration of $3,200. Payments were made from time to time, the final payment being made April 3, 1917. Patent was issued July 3, 1919. The charter of the lumber company expired and B. J. Boorman and C. Boorman became trustees thereof by operation of law, and brought this proceeding to recover the $3,200 paid for the land, alleging that the sale was made in contravention of certain provisions of the Constitution. It is contended that the land is within three miles of the city or town of Cut Bank, and under the provisions of section 1, Article XVII of the Constitution must be classified as Class Four lands, and under section 2 of the same Article can be sold only in alternate tracts of five acres each.

Sections 1 and 2, Article XVII of the Montana Constitution, provide as follows:

"Section 1. All lands of the state that have been, or that may hereafter be granted to the state by congress, and all lands acquired by gift or grant or devise, from any person or corporation, shall be public lands of the state, and shall be held in trust for the people, to be disposed of as hereafter provided, for the respective purposes for which they have been or may be granted, donated or devised; and none of such land, nor any estate or interest therein, shall ever be disposed of except in pursuance of general laws providing for such disposition, nor unless the full market value of the estate or interest disposed of, to be ascertained in such manner as may be provided by law, be paid or safely secured to the state; nor shall any lands which the state holds by grant from the United States (in any case in which the manner of disposal and minimum price are so prescribed) be disposed of, except in the manner and for at least

the price prescribed in the grant thereof, without the consent of the United States. Said lands shall be classified by the board of land commissioners, as follows: First, lands which are valuable only for grazing purposes. Second, those which are principally valuable for the timber that is on them. Third, agricultural lands. Fourth, lands within the limits of any town or city or within three miles of such limits; provided, that any of said lands may be reclassified whenever, by reason of increased facilities for irrigation or otherwise, they shall be subject to different classification.''

''Sec. 2. The lands of the first of said classes may be sold or leased, under such rules and regulations as may be prescribed by law. The lands of the second class may be sold, or the timber thereon may be sold, under such rules and regulations as may be prescribed by law. The agricultural lands may be either sold or leased, under such rules and regulations as may be prescribed by law. The lands of the fourth class shall be sold in alternate lots of not more than five acres each, and not more than one-half of any one tract of such lands shall be sold prior to the year one thousand nine hundred and ten (1910).''

Petitioners allege that they were ignorant of the restrictions on the sale of such lands until within a year just prior to beginning this proceeding.

The board in effect admits the land was not classified or sold in accordance with the provisions of the Constitution quoted, and no question is raised as to Cut Bank having acquired the status of a city or town as defined by this court in *Davis* v. *Stewart*, 54 Mont. 429, 171 Pac. 281, at the time of the sale, but oppose refunding the purchase price on the following grounds:

''1. Unreasonable delay in making application for writ of mandamus bars issuance of writ—Laches.

''2. Proceedings are barred by statute of limitations.

''3. The statute upon which relators rely does not require respondents to perform the act sought to be compelled.

"4. The act sought to be compelled is beyond the power and duty of respondents to perform.

"(a) Lack of appropriation and power of respondents to draw warrants.

"(b) Non-existence of funds required to perform.

"5. The issuance of the writ would operate inequitably.

"6. The proceeding is in effect an action against the State of Montana and the general immunity of the State from liability to suit requires the quashing of the writ."

The provisions of the Constitution quoted above are clear and unambiguous and require no construction. They construe themselves. They are self-executing and mandatory in form, and it is clear that a legal sale of state lands of the character of those involved can be made only in the manner prescribed thereby.

We think the general rule—we may say the universal rule—followed in the construction of constitutional provisions is forcibly expressed in *Sandelin* v. *Collins,* 1 Cal. (2d) 147, 33 Pac. (2d) 1009, 1012, 93 A. L. R. 956, where the court had under consideration the question whether a hotel proprietor served or permitted customers to consume in his dining-room intoxicating liquor in violation of certain constitutional provisions. The court said: "In other words, under the plain terms of the Constitution, intoxicating liquors, other than wine and beer, may not under any circumstances lawfully be consumed in hotel dining rooms or other public drinking places, in whatsoever manner said liquor may be supplied, and wine and beer may be consumed in public places * * * only with meals. This conclusion is not arrived at by any process of construction or the ascertainment of the intention of the people of the state in enacting section 22 of Article XX of the Constitution, but is compelled from the plain meaning of the words used. In such case there is no opportunity for construction; nor is there any function for the court to perform other than to apply to the facts the meaning which the constitutional provision plainly imports."

The board is a state agency and it is axiomatic that such an agency has only such powers as are expressly conferred and such additional powers as are essential to the exercise of the powers expressly granted. Such additional powers are described as implied powers. Clearly there is no latitude allowed for exercise of any implied power in the matter in controversy. Section 1805.3, Revised Codes, in defining the powers of the board provides in part: "The enumeration in this Act of specific powers conferred upon the board shall not be construed as to deprive the board of other powers not enumerated but inherent in the general and discretionary powers conferred by the Constitution, and necessary for the proper discharge of its duties; *but there can be no such implied powers inconsistent with any part of the Constitution,* nor shall any inherent powers be assumed to exist which would be inconsistent with any statutory provision or with the general rule and principle herein stated."

The power to sell state lands, such as those sold to petitioners, in other than in alternate tracts of five acres each can be predicated on no other provisions of the Constitution than those quoted, and the legislature is without power to prescribe any other mode or to confirm a sale not made in accordance with such provisions. Hence, the sale being void, the only question left for solution is the mode of adjustment.

Taking up the several defenses of the board as heretofore set out, a number of them would be meritorious if we were considering the merits of the contentions of the petitioners alone. We are not greatly impressed with petitioners' contention that all the equities are with them, when 28 years elapsed after the contract was made before any relief was sought. Any equities involved must give precedence to the more vital question of observance of constitutional provisions, and from that standpoint alone this controversy must be determined.

The board's defenses 1 and 2, relating to laches, and the statute of limitations, have no application. The stat- ute of limitations may not be relied upon if not pleaded, but

in any event that question is immaterial. The sale is clearly void and "time does not confirm a void act." (Sec. 8768, Rev. Codes; *State ex rel. Brink* v. *McCracken*, 91 Mont. 157, 6 Pac. (2d) 869.) Maxims of jurisprudence relied upon by the board set forth in sections 8744, 8745, 8746 and 8748, Revised Codes, apply to the board as well as to the petitioners, and none of them can be construed to modify constitutional provisions.

We cannot uphold an act which is in plain violation of the Constitution, irrespective of the lapse of time. Such cases as *State ex rel. Bennetts* v. *Duncan*, 47 Mont. 447, 133 Pac. 109, cited by the board in support of its contention that any right to the remedy by mandamus will be barred if not promptly demanded, cannot be admitted to control the situation in the case at bar.

As to defense numbered 3, the attempt of the legislature in the 1919 session by the enactment of Chapter 78, section 1844, Revised Codes of 1921, repealed by the 1927 session, Chapter 60, to make classification of lands by the board final, is utterly futile when such classification is made in contravention of the mode prescribed by the Constitution. Recognition of the validity of Chapter 78, supra, would, in effect, acknowledge the power of the legislature to modify a plain constitutional provision. The Act was in conflict with the Constitution and has been repealed.

Defense numbered 4, lack of appropriation: It appears to us that it would be reasonable and logical to hold that the $3,200 is in the hands and under the control of the board as trustee. It was collected on a void contract; the board received the money for land to which it had no power to convey title in the sale made. It is our opinion that the $3,200 is not part of the common school fund which must be kept inviolate, and that it is the duty of the board to cause the amount to be refunded, not because of any particular equitable grounds, but because it sold something to which it cannot convey legal title, and it is powerless to remedy the situation and convey title of any nature, clear or otherwise. However,

to say that the board holds the $3,200 as trustee and may refund it without specific appropriation would conflict to some extent with a former decision of this court. (*In re Pomeroy,* 51 Mont. 119, 151 Pac. 333, decided in 1915.) Hence we prefer to rely on section 1805.116, Revised Codes, for authority to direct that the refund be made.

Petitioners contend the board has the authority to refund the money under section 1805.116, which provides: "If any money has been erroneously paid or shall hereafter be erroneously paid to the state on any permit, lease, certificate of purchase, patent or loan or in any other transaction, it shall be the duty of the state board of land commissioners to cause such money erroneously paid to the state to be refunded to the person entitled thereto from the proper fund."

We think the legislature must have enacted this section to take care of just such matters as that involved in this proceeding, without the necessity and delay attendant upon a specific appropriation by the legislature. No injury is done to anyone by the state's refunding money it received on a void contract, and this statute provides a simple and effective mode that should be followed in refunding money the board holds, such as that involved here. No appropriation is necessary for the board to cause money under its control to be drawn from the treasury when the board makes an investment.

Section 1805.3, Revised Codes, provides in part: "It [the board] shall have and exercise general authority, direction and control over the care, management and disposition of all state lands *and the funds* arising from the leasing, use, *sale* and disposition of such lands or otherwise coming under its administration." This court has held in a number of decisions that special funds need not be specifically appropriated. (*State ex rel. City of Missoula* v. *Holmes,* 100 Mont. 256, 290, 47 Pac. (2d) 624, 100 A. L. R. 581; *State ex rel. Hawkins* v. *State Board of Examiners,* 97 Mont. 441, 35 Pac. (2d) 116, and cases cited.) The legislature by Chapter 165, Laws of 1939, directed that funds collected from various school districts and counties under the State Fire Insurance Act be refunded

but made no specific appropriation therefor, but provided the manner the respective amounts to be refunded should be determined. In *State ex rel. Bonner* v. *Dixon,* 59 Mont. 58 76, 195 Pac. 841, 844, this court said: "Generally, the word 'appropriation,' as used throughout our Constitution, has reference exclusively to the general fund." (See, also, *Martin* v. *State Highway Com.,* 107 Mont. 603, 88 Pac. (2d) 41.)

In the case of *State ex rel. Boynton* v. *Kansas State Highway Com.,* 139 Kan. 391, 32 Pac. (2d) 493, 496, the court had under consideration the authority of the highway commission to expend funds borrowed under an Act of the legislature from the federal government for state highway purposes. The question was raised by the contention that the Act violated section 23 of Article II of the Constitution of Kansas, which is substantially similar to our section 34 of Article V, relative to appropriations by the legislature. The court said: "Article II, section 24, of our Constitution applies only to moneys that find their way into the state treasury. When our people, by amending Article XI, section 8 of our Constitution, making two sections of it—8 and 9 (as renumbered 9 and 10)—so that the state could construct and maintain a state system of highways and levy special taxes on motor vehicles and motor fuels for that purpose, they made no specific provision that the moneys so raised and used should necessarily find their way into the state treasury, but left the legislature free to provide for the collection and disbursement of such funds in the way it deemed best. What the legislature did was to provide that these moneys, as collected, should be transmitted to the state treasurer and by him placed in the highway fund and disbursed on proper orders by the highway commission. (Sections 17, 18, Chapter 225, Laws 1929, as amended by Laws 1933, Chapter 241, now R. S. Supp. 1933, 68—416, 68—417.) Since these funds are not required by the Constitution to find their way into the state treasury, and by statute do not do so, Article II, section 24, requiring appropriation of moneys from the state treasury, has no application. These funds are collected for a specific purpose.

The legislature would have no authority to appropriate them for other purposes. They are collected, segregated, set aside, and can be used for one purpose only, namely, the construction and maintenance of state highways.''

Section 1805.116 does not make any specific appropriation, but, as will be noted by the above citations, not all money drawn out of the treasury is specifically appropriated. But in all such cases we have found, the amount to be withdrawn is referred to in such a manner that it can be readily determined if not specifically stated in the order or authority for the withdrawal. We think this section is sufficient legislative sanction for the payment of the $3,200 to petitioners. The foregoing authorities on this point, we believe justify the court in holding that the refund may be made by authority of section 1805.116, rather than directing petitioners to the legislature to obtain an appropriation.

In the case of *State ex rel. Clark* v. *Bailey,* 99 Mont. 484, 44 Pac. (2d) 740, we held that the petitioner was entitled to payment out of a city fund which had been depleted by defalcation of the city treasurer, but was not entitled to mandamus at the time for the reason that there were not sufficient funds, other than trust funds, in the city treasury to meet the demand, but stated it was our opinion that by proper proceedings against the city, the petitioner would be entitled to judgment. In the case at bar there is no question about there being sufficient funds in the hands or under the control of the State Board of Land Commissioners available to make the refund. The $3,200 never legally became a part of the common school fund.

Petitioners' claim of interest on the amount is denied. In granting the relief prayed, we are, as heretofore stated, merely furnishing a remedy to adjust an illegal sale of land by which the common school fund was enhanced to the extent of $3,200, and are of the opinion that the paying of the money was not an investment by the petitioners upon which they may claim any return. Petitioners had the use of the land.

Defense numbered 5 is on the contention that the issuance ▉ of the writ would operate inequitably. Questions of equity, or of any other kind, cannot be permitted to invalidate and render inoperative constitutional provisions whether it be in the interest of the state or otherwise. It does not appear that the state has suffered from the transaction. It has had the use of the money for approximately twenty-five years; petitioners contend the income has not been sufficient to meet the charges for taxes and otherwise, but such matters are immaterial where, as here, the controversy must be determined by the law. The arguments presented on this point, we think, need no further consideration.

Defense numbered 6 is on the question that the proceeding is ▉ an action against the state. The rule is too well settled in this state that mandamus will lie to compel state boards or officers to perform a clear, legal duty, to require extended citations in support thereof or justify extended argument. We are satisfied that it is the clear, legal duty of the board to refund the money, and the proceeding is not such a one as may be said to be against the state. To cause a state board to refund the money imposes upon it merely a ministerial act. State officers and boards may be compelled by mandamus to perform a clear ministerial duty. (*State ex rel. Mitchell Furniture Co.* v. *Toole,* 26 Mont. 22, 66 Pac. 496, 91 Am. St. Rep. 386, 55 L. R. A. 644.)

It has been suggested that to grant the writ in the case at bar would be to conflict with the case of *State ex rel. Blenkner* v. *Stillwater County,* 102 Mont. 130, 56 Pac. (2d) 1085. We think from a careful review of that case, it will be found that the two opinions do not conflict in any material particular.

The judgment is reversed and the cause remanded to the district court with instructions to overrule the motion to quash.

CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES ANGSTMAN and ERICKSON concur.

MR. JUSTICE STEWART:

I dissent. I think this case is absolutely controlled by *State ex rel. Blenkner* v. *Stillwater County*, 102 Mont. 130, 56 Pac. (2d) 1085, and the case of *In re Pomeroy*, 51 Mont. 119, 151 Pac. 333. Defendants' motion to quash was properly sustained and should be affirmed. A writ of mandate will only issue to compel the performance of a clear legal duty. There was no showing that the defendants have failed to perform such duty. The case of *McAdoo Petroleum Corp.* v. *Pankey,* 35 N. M. 246, 294 Pac. 322, is exactly in point and sustains the view I have expressed. (See, also, *First Nat. Bank of Plains* v. *Sanders County,* 85 Mont. 450, 279 Pac. 247.)

The corporation that bought the land used it during its legal life. When its charter expired and it died a legal death and could no longer use the property by reason of failure to re-incorporate, the surviving directors, representing the stock-holders, the heirs of the corporation, ask that the purchase price be returned from the school fund after 28 years have elapsed. There is no equity in the demand and no law to support it. The school funds are sacred and inviolate. Heretofore they have been well guarded in accordance with the mandate of the Constitution, which declares that such funds "shall forever remain inviolate, guaranteed by the state against loss or diversion." (Sec. 3, Art. XI.)

I am satisfied that the majority opinion is wrong, and that the precedent set will arise to plague this court in the future and, if it is adhered to, it will result in serious loss of the school funds set apart by the Constitution for the children of this state.

Rehearing denied October 10, 1939.